UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

MICHAEL HOLDEN, by and through )
his attorney-in-fact, Martha Miller, )
                                                               )
    Plaintiff, )
                                                               )
v. )
                                                               ) Case No. 4:23-cv-20-TAV-SKL
THE WATERS OF SHELBYVILLE, LLC, )
d/b/a THE WATERS OF SHELBYVILLE, )
                                                              )
    Defendant. )

## REPORT AND RECOMMENDATION

Before the Court is a Renewed Motion to Compel Arbitration and to Stay Proceedings ("Renewed Motion") filed by Defendant The Waters of Shelbyville, LLC, d/b/a The Waters of Shelbyville, with a supporting brief and exhibits [Doc. 31 & Doc. 32]. Plaintiff Michael Holden, acting by and through his attorney-in-fact, Martha Miller, filed a response in opposition, with supporting exhibits [Doc. 36]. Plaintiff asks the Court to deny the Renewed Motion "and direct the Parties to proceed with litigation in this Court." [Doc. 36 at Page ID # 348]. Defendant did not file a reply, and the time for doing so has passed. *See* E.D. Tenn. L.R. 7.1. This matter is now ripe.

As set forth below, I **RECOMMEND** the Renewed Motion be **DENIED**.

**I.    BACKGROUND**

In summary, Mr. Holden suffers from several debilitating medical conditions. Ms. Miller is his sister. Mr. Holden was admitted to and began receiving care from Defendant on June 11, 2019. On that same date, Ms. Miller signed a document titled "Agreement to Resolve Disputes by Binding Arbitration" ("Arbitration Agreement"), which purports to waive Mr. Holden's right to

"a trial in court and a trial by a jury for any future legal claims [he] may have against [Defendant]." [Doc. 32-1 at Page ID # 303].[1] Ms. Miller signed the Arbitration Agreement as Mr. Holden's "Representative." [*Id.* at Page ID # 302]. The Arbitration Agreement provides that the Representative "may be an 'Agent,' a 'Guardian,' or a 'Surrogate.'" [*Id.*]. Those terms, in turn, are defined as follows:

> An "Agent" is a person designated by Resident in a document such as a living will or a durable power of attorney who may make health care decisions on behalf of the Resident.
>
> A "Guardian" is a person appointed by a court as a guardian or conservator of the Resident to make health care decision(s) on behalf of the Resident.
>
> A "Surrogate" is a person, other than an Agent or a Guardian, which has authority to make health care decisions on behalf of the Resident.

[*Id.*].

The Arbitration Agreement continues:

### WHO MUST SIGN THIS AGREEMENT

> To be effective, this Agreement must be signed by the Facility and the Resident's Representative. The Resident must also sign this Agreement if he or she is able to understand the significant benefits, risks, and alternatives to admission to the Facility and to make and communicate health care decisions[.]
>
> If the Representative is an Agent or a Guardian, the Representative must provide the Facility with a copy of the document creating the agency or guardianship.

---

[1] As Plaintiff points out, Defendant originally sought to compel enforcement of an arbitration agreement executed in February 2022 [*see* Doc. 36 at Page ID # 345 n.1; *see also* Doc. 18-1]. Defendant does not mention or cite to the 2022 arbitration agreement in its Renewed Motion. Accordingly, the Court considers only whether to compel arbitration in reliance on the 2019 Arbitration Agreement, as the parties have done. The 2019 Arbitration Agreement provides: "If not rescinded within thirty (30) days, this Arbitration Agreement shall remain in effect for all subsequent stays at Facility, even if Resident is discharged from and re-admitted to Facility." [Doc. 32-1 at Page ID # 306].

> If the Resident is unable to sign or fully understand this Agreement, and if the Representative is a Surrogate, then the Surrogate must also sign, in his or her own individual capacity, the following:
>
> I, ___Martha Miller (Responsible Party)___, hereby certify the following to be true:
>
> • Resident is unable to understand the significant benefits, risks, and alternatives to admission to the Facility and to make and communicate health care decisions;
>
> • Either Resident has no Agent or Guardian, or such Agent or Guardian is not reasonably available;
>
> • I have exhibited, and will continue to exhibit, special care and concern for Resident; I am familiar with Resident's personal values; I am reasonably available to make health care decisions in the best interest of Resident; and I am willing to act as Resident's Surrogate.
>
> s/Martha Miller_____        6-11-19
> Signature – Responsible Party      Date
>
> ___sister_____
> Relationship to Resident

[*Id.* at Page ID # 303].

At some point Mr. Holden was discharged from care, but the record reflects he was readmitted on February 24, 2022. Ms. Miller alleges that during the February 2022 stay, Mr. Holden "suffered injuries and harm," which led the filing of the instant lawsuit on June 22, 2023 [Doc. 36 at Page ID # 347].

## II. STANDARDS

### A. Dispositive vs. Non-Dispositive

As a threshold matter, I note the law in the Sixth Circuit is unclear as to whether motions to compel arbitration are "dispositive" for purposes of 28 U.S.C. § 636(b)(1). The United States

Court of Appeals for the Sixth Circuit has not definitively addressed the issue, and there is a split of authority among other federal courts. *See Milan Exp. Co., Inc. v. Applied Underwriters Captive Risk Assur. Co., Inc.*, 993 F. Supp. 2d 846, 850 (W.D. Tenn. 2014) (observing split of authority exists but noting "[s]everal district courts in this Circuit" find motions to compel arbitration dispositive, and finding motion dispositive), *vacated on other grounds*, 590 F. App'x 482 (6th Cir. 2014); *see also Soriano v. Experian Info. Sols., Inc.*, No. 2:22-cv-197-SPC-KCD, 2022 WL 17551786, at *1 (M.D. Fla. Dec. 9, 2022) (finding that "[a]lthough the 11th Circuit has not explicitly provided guidance on whether a motion to compel arbitration is non-dispositive, other courts have found that motions to compel arbitration are non-dispositive," and finding motion non-dispositive). "The difference determines the standard of review applied by the Article III District Court Judge." *Beattie v. TTEC Healthcare Solutions, Inc.*, No. 18-cv-03098-RM-NRN, 2019 WL 1594254, at * (D. Colo. April 15, 2019), *report and recommendation rejected on other grounds*, 2019 WL 2189481 (D Colo. May 21, 2019). If objected to, an order on a non-dispositive motion is reviewed by the District Court Judge under a "clearly erroneous or . . . contrary to law" standard. *See* Fed. R. Civ. P. 72(a). By contrast, a report and recommendation issued on a dispositive motion is subject to a *de novo* review. *See* Fed. R. Civ. P. 72(b).

In an abundance of caution, I have assumed for present purposes the motion is dispositive, and I therefore issue this Report and Recommendation rather than address the Renewed Motion by order. *See Beattie*, 2019 WL 1594254, at *3 (citing *Vernon v. Qwest Comms. Int'l, Inc.*, 925 F. Supp. 2d 1185, 1189 (D. Colo. 2013)).

**B.     The FAA**

Turning to the substance of the motion, Defendant argues for application of the Federal Arbitration Act ("FAA"). Defendant cites to the "Laws Governing Arbitration" provision of the

4

Arbitration Agreement, which provides: "Except as expressly set forth herein, the arbitration proceeding shall be governed by the [FAA]." [Doc. 32-1 at Page ID # 305]. Plaintiff does not dispute Defendant's position regarding the applicability of the FAA, and I find it applies to the Arbitration Agreement at issue in this case.

Courts must remember "the basic purpose of the [FAA] is to overcome courts' refusals to enforce agreements to arbitrate." *Solomon v. CARite Corp. LLC*, 837 F. App'x 355, 359 (6th Cir. 2020) (quoting *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 270 (1995)). Arbitration agreements are on "equal footing with other contracts," and therefore must be enforced according to their terms. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010).

Section 2 of the FAA provides:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

When considering a motion to compel arbitration, courts "'engage in a limited review' to determine whether the grievance is arbitrable." *United Food & Com. Workers, Loc. 1995 v. Kroger Co.*, 51 F.4th 197, 202 (6th Cir. 2022) (citing *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)). Courts must first determine whether there is a "valid agreement to arbitrate." *See id.* (cleaned up). If so, the court must then determine "whether the grievance 'falls within the substantive scope of that agreement.'" *Id.* (citing *Javitch*, 315 F.3d at 624). Under Section 4 of the FAA, if the court "is 'satisfied that the making of the agreement [to arbitrate]' (or its breach) 'is not in issue,' the court 'shall make an order' compelling arbitration." *Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 837 (6th Cir. 2021) (quoting 9 U.S.C. § 4). "If

instead the court finds that the 'making of the arbitration agreement' (or its breach) is 'in issue,' the court 'shall proceed summarily to the trial' on the disputed question." *Id.* (quoting 9 U.S.C. § 4).

The standards applicable to Federal Rule of Civil Procedure 56 "govern whether a court should hold a trial under § 4 when a party alleges that no contract [arbitration agreement] exists." *Id.* (citations omitted); *see also Bazemore v. Papa John's U.S.A., Inc.*, 74 F.4th 795, 797-98 (6th Cir. 2023) (applying Rule 56 standards to a motion to compel arbitration). Therefore, the Court will only grant a motion to compel arbitration "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Boykin*, 3 F.4th at 838. The Court views the facts in the light most favorable to the non-moving party and makes all reasonable inferences that can be drawn from those facts. *See Boykin*, 3 F.4th at 838; *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

Under Rule 56, Defendant has the "initial duty to present evidence that would allow a trier of fact to find all required elements of a contract (including [Plaintiff's] acceptance)[.]" *Boykin*, 3 F.4th at 839 (citations omitted); *see also Bazemore*, 74 F.4th at 978 ("The party seeking arbitration must prove that such an agreement exists."). If Defendant meets that burden, Plaintiff can establish a genuine issue of material fact for trial by presenting "'specific facts, as opposed to general allegations,' that would allow a rational trier of fact to find" that Plaintiff is not subject to the Arbitration Agreement. *Boykin*, 3 F.4th at 839 (quoting *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020)). Put another way, "[t]o show that the validity of an arbitration agreement is 'in issue,' 'the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate.'" *Sanders v. Allenbrooke Nursing & Rehab. Ctr., LLC*, No. 2:20-cv-02001,

6

2020 WL 5576696, at *3 (W.D. Tenn. Sept. 17, 2020) (quoting *Great Earth Cos.*, 288 F.3d at 889).

Because arbitration agreements are "fundamentally contracts," courts review their enforceability "according to the applicable state law of contract formation." *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007). "As such, arbitration agreements may be invalidated for any reason that a contract can be invalidated for under state law, such as coercion, duress, or incapacitation." *Solomon*, 837 F. App'x at 359 (citing *Jackson*, 561 U.S. at 67). The parties appear to agree Tennessee law is the applicable state law, and so the Court looks to Tennessee state law as pertinent. *See Sanders*, 2020 WL 5576696, at *3 (W.D. Tenn. Sept. 17, 2020) (holding where parties agree to state substantive law, the court "need not conduct a choice-of-law analysis sua sponte" (citation omitted)).

## III. ANALYSIS

It is undisputed Plaintiff (Mr. Holden) did not sign the Arbitration Agreement himself, only Ms. Miller did. Defendant argues Ms. Miller had the authority to bind Plaintiff to the Arbitration Agreement under several theories: (1) pursuant to a durable power of attorney executed by Plaintiff in 2016 [("2016 POA") Doc. 32-2]; (2) Ms. Miller's apparent authority to bind Plaintiff under the circumstances; or (3) Ms. Miller's express authority granted to her by Plaintiff in some manner other than through the 2016 POA.[2]

---

[2] Defendant also alludes to Ms. Miller being Plaintiff's "healthcare surrogate." [Doc. 32 at Page ID # 294]. It is not clear whether Defendant intends to refer to a "surrogate" as set forth in Tennessee Code Annotated § 68-11-1806 or as set forth in the Arbitration Agreement. Regardless, the statute does not appear to apply in this case. Neither party cites to a finding by a "designated physician" that Plaintiff "lack[s] capacity," a prerequisite under the statute for a surrogate to make healthcare decisions. Tenn. Code Ann. § 68-11-1806(b)(1); *Denton v. Allenbrooke Nursing & Rehab. Ctr., LLC*, 495 F. Supp. 3d 601, 610-11 (W.D. Tenn. 2020). Ms. Miller also testified during her deposition that she did not believe any doctor had ever formally declared Plaintiff incompetent [Doc. 32-3 at Page ID # 312].

7

### A.     2016 POA

The 2016 POA provides in relevant part:

>       I, Michael Shane Holden, a resident of Bedford County, Tennessee, being of sound mind and under no legal disability, . . . do now hereby make, constitute and appoint my sister, MARTHA MILLER, and JEREMY MILLER to act as my true and lawful attorneys-in-fact and general business agent and proxy to manage all my affairs; and, for such purposes, for me in my name, place and stead, and for my use and benefit, and as my act and deed, to do and perform, among other things.
>
> . . . .
>
> 5.     **To institute, defend, prosecute, compromise and dispose of any suits at law or equity, administration or arbitration proceedings, or otherwise engage in litigation or in the compromise and settlement of any claims, suits or proceedings, in my name or for my benefit and at my expense, and to sign in my behalf any and all pleadings, receipts, releases, deeds or other paper writings as fully and to all intents and purposes as if I were personally acting and executing same; and also acknowledge and record same**.
>
> . . . .
>
>       GIVING AND GRANTING unto my said attorney-in-fact full power and authority **to do and perform all and every act, deed, and thing with respect to my property and estate and business affairs, with full power of substitution in the premises, from time to time, as fully and effectually to all intents and purposes as I might or could do in my own proper person if personally present**.  The above specially enumerated powers are in aid and exemplification of the complete and general powers herein granted and not in limitation or definition thereof.
>
> . . . .
>
>       . . . . In the event of my physical or mental disability, this Power of Attorney shall not be revoked but shall continue in full force and effect.
>
>       This Power of Attorney shall not be affected by any subsequent disability or incapacity of mine if such should occur.  It is my express intent that the authority herein conferred upon my said

8

attorney-in-fact shall be exercisable in all events notwithstanding my subsequent disability or incapacity.

[Doc. 32-2 at Page ID # 307-08].

In reliance on the language quoted in bold, Defendant argues Ms. Miller "had authority to sign the [Arbitration Agreement] as attorney-in-fact" for Plaintiff [Doc. 32 at Page ID # 293]. Defendant emphasizes that, during her deposition, Ms. Miller testified:

> Q. So you're saying that prior to the execution of [a subsequent power of attorney] you did think that you had authority to sign your brother into the nursing home?
>
> A. I mean, yeah, I thought I did, I mean with the Power of Attorney I had previously. You know, I thought it, you know, gave me permission to do things like that. Like I said, I wasn't familiar with the healthcare part, so. . .
>
> . . . .
>
> Q. Did you believe that this Power of Attorney gave you authority to sign the admission and financial agreement in 2019 for your brother's admission to the Waters of Shelbyville?
>
> A. I'm not sure. I mean, I would think so, yes.
>
> . . . .
>
> Q. Did you believe that this Power of Attorney from 2016 gave you authority to sign the arbitration agreement for your brother's admission in 2019?
>
> A. I mean, I think it gave me – yes. I mean, I would think so. But I don't know about the – what all it was. You know, I thought I just signing the admission papers, you know, for him to be able to go to the nursing home. So – I mean, I'm not familiar with all that.
>
> . . . .
>
> Q. Do you recall ever telling staff in 2019, that you had power of attorney over your brother?

A. Well, yeah, I'm sure I did.

[Doc. 32-3 at Page ID # 313; Page ID # 314; Page ID # 316].

Regardless, as argued by Plaintiff, under Tennessee law, "an attorney in fact may not make healthcare decisions unless the agreement '*specifically authorizes* the attorney in fact to make health care decisions.'" *Sykes v. Quince Nursing & Rehab. Ctr., LLC*, No. 2:19-cv-02602, 2020 WL 7866881, at *2 (W.D. Tenn. Sept. 1, 2020) (quoting Tenn. Code Ann. § 34-6-203 (emphasis in *Sykes*))). As in *Sykes*, the 2016 Power of Attorney in this case is "silent as to healthcare decisions." 2020 WL 7866881, at *2.

Furthermore, Tennessee courts, and at least one federal court applying Tennessee law, hold that "the execution of admission documents at a health care facility is a healthcare decision." *Jones v. Allenbrooke Nursing & Rehab. Ctr., LLC*, No. W2019-00448-COA-R3-CV, 2019 WL 6842372, at *3 (Tenn. Ct. App. Dec. 16, 2019) (holding attorney-in-fact could not bind resident to arbitration agreement executed in connection with resident's nursing home admission, where POA agreement was silent as to healthcare decisions); *Williams v. Smyrna Residential, LLC*, No. M2021-00927-COA-R3-CV, 2022 WL 1052429, at *6 (Tenn. Ct. App. Apr. 8, 2022) ("Sams lacked authority under the POA either to admit Decedent to Azalea Court in the first place or to sign the Agreement [to arbitrate] in connection with Decedent's admission as those were healthcare decisions."), *appealed*; *Crawford v. Allenbrooke Nursing & Rehab. Ctr., LLC*, No. 2:21-cv-02054-TLP-tmp, 2021 WL 3926244, at *7-8 (W.D. Tenn. Sept. 1, 2021) (refusing to enforce arbitration agreement signed pursuant to general POA; holding that "entering the Agreement was a health care decision under Tennessee law" (citations omitted)).

10

The Court previously raised this issue in its September 8, 2023 Order permitting arbitration-related discovery [Doc. 25]. Nevertheless, Defendant did not address this issue in its opening brief or file a reply to address the authorities cited by Plaintiff on the issue in his response.

It is undisputed the 2016 POA did not specifically authorize Ms. Miller to make healthcare decisions for Plaintiff. Accordingly, regardless of Ms. Miller's beliefs, under Tennessee law the 2016 POA did not grant her authority to bind Plaintiff to the Arbitration Agreement, and Defendant's reliance on the 2016 POA in support of the Renewed Motion is misplaced. Accordingly, I conclude arbitration cannot be compelled on this ground as a matter of law.

### B. Actual Authority Other than from 2016 POA

Defendant also argues Ms. Miller had actual authority to bind Plaintiff to the Arbitration Agreement pursuant to a combination of "prior practice" and Ms. Miller and Plaintiff's behavior during the admission process when the Arbitration Agreement was signed [Doc. 32 at Page ID # 291]. Defendant emphasizes that during the admission process, Plaintiff was close by and he never objected to Ms. Miller signing the admission paperwork, and Ms. Miller never indicated to staff that Plaintiff should or could sign his own admission paperwork.

Defendant cites to Ms. Miller's deposition testimony that Plaintiff has never "made his own medical decisions," rather Ms. Miller is the "one that made the decisions." [Doc. 32-3 at Page ID # 310-11]. Ms. Miller further testified Plaintiff "knew he was going to the nursing home" and was present when Ms. Miller signed the paperwork, but she "didn't explain the paperwork . . . to him [*id.* at Page ID # 317]. When asked if Plaintiff gave her "verbal authority to sign that paperwork in 2019," Ms. Miller testified:

> A. I mean, he – I'm not sure exactly how to answer that. I mean, he knew he was going to the nursing home. He knows he's – you know, everything that was going on, so – I mean, no, I mean, I don't guess he, like, said, "Here, sign this," no.

11

> But he knew, you know, what was going on and he knew that I made, you know, the decisions for him. So . . .
>
> Q. Did your brother, [Plaintiff], know that you signed the paperwork in 2019?
>
> A. Well, no, he wouldn't have known what it was.

[Doc. 32-3 at Page ID # 320].

For authority to support this position, Defendant cites to *Necessary v. Life Care Centers of America, Inc.*, No. E2006-00453-COA-R3-CV, 2007 WL 3445536 (Tenn. Ct. App. Nov. 16, 2007). In that case, the plaintiff-wife sued for injuries her husband allegedly sustained while in the care of the defendant-facility. The facility argued the case should be dismissed or stayed pending arbitration, in reliance on an agreement signed only by the wife, as the "Legal Representative" of her husband. *Id.* at *2. The trial court found the arbitration agreement was not enforceable, in part because there was no written power of attorney for healthcare (or any written power of attorney at all). The Tennessee Court of Appeals reversed, reasoning that the parties agreed the wife had express oral authority from her husband to sign admission-related documents on his behalf and to make all decisions regarding his admission into the facility. The court rejected the wife's argument that the scope of her authority did not include the authority to execute an admission-related arbitration agreement:

> Plaintiff essentially argues that she had express authority from the Decedent, who was competent to give her that authority, to sign all of the admission documents and make all of the decisions regarding his admission to Life Care's facility-except one: she did not have his authority to sign an arbitration agreement, even though he did not withhold such authority. Such a conclusion would result in the type of "untenable" situation described in *Owens* [*v. National Health Corp.*, 263 S.W.3d 876 (Tenn. 2007)]. Therefore, we hold that Plaintiff, who had the Decedent's express authority to sign the admission documents at the healthcare facility, also had the

authority to sign the arbitration agreement on the Decedent's behalf as one of those admission documents.

*Necessary*, 2007 WL 3446636, at *5 (footnote omitted). The court also noted the husband's mental competency was undisputed, as he was only limited by a physical issue at the time the wife signed the admission documents, including the arbitration agreement at issue.

Similarly, in *Watson v. Quince Nursing & Rehabilitation Center, LLC*, No. W2019-00261-COA, 2019 WL 6877897 (Tenn. Ct. App. Dec. 17, 2019), the Tennessee Court of Appeals held that, where the plaintiff conceded the decedent's son had "express oral authority" to sign documents required for the decedent's admission into a nursing home, an arbitration agreement signed by the son in connection with the admission was valid and enforceable. *Id.* at *4.

This case is distinguishable from *Necessary* and *Watson* in that here, Plaintiff takes the position Ms. Miller lacked authority to sign any of the admission-related documents on his behalf [*see* Doc. 36 at Page ID # 355]. This case does not concern the scope of Ms. Miller's authority but rather whether she had authority to make binding healthcare decisions and sign related documents on behalf of Plaintiff at all. In *Harris v. Midtown Center for Health and Rehabilitation, LLC*, No. 21-5646, 2022 WL 1261830 (6th Cir. Apr. 28, 2022), the Sixth Circuit distinguished *Necessary* and *Watson* for this same reason. There, Harris's wife, Mavis, signed an arbitration agreement on his behalf, claiming to be his "representative." *Id.* at *1. The district court denied the defendant's motion to compel arbitration and the Sixth Circuit affirmed. *Id.* Referring to *Necessary* and *Watson*, the *Harris* court held:

> To be fair, those cases are factually similar to this one. In both, a family member signed an arbitration agreement on behalf of another family member while admitting them into a nursing home. And in both, the nursing homes argued that the resident's estate should be bound by that signature. The Tennessee Court of Appeals ultimately agreed with the nursing homes, and Midtown urges us to do the same.

13

> But those cases turned on a different issue. There, the plaintiffs conceded that the family members had express authority to sign the admissions documents on behalf of the resident. Their only argument was that this authority didn't include signing an arbitration agreement. So the question before the court was a narrow one. The court wasn't answering whether the family member had authority to sign the admissions documents – that was undisputed – rather, it was determining the scope of that authority. Thus, in *Necessary* the court held that "[p]laintiff, who had the [d]ecedent's express authority to sign the admission documents at the healthcare facility, also had the authority to sign the arbitration agreement on behalf of the [d]ecedent's behalf as one of those admission documents." And the court repeated that holding in *Watson*.
>
> Here, by contrast, the estate doesn't make the same concession. In fact, the estate argues that Mavis lacked any authority to sign Harris's admissions documents. So we face the question undisputed in *Necessary* and *Watson*: Was Mavis authorized to sign Harris's admissions documents? And on that question, *Necessary* and *Watson* offer no guidance.

*Harris*, 2022 WL 1261830, at *3-4 (internal citations omitted).

The *Harris* court then addressed the same issue presented by the instant motion: whether the purported agent (Mavis) had authority to bind the purported principal (Harris). The court ultimately concluded the defendant failed to prove Mavis had proper authority, because the defendant presented only Mavis's own representations "that she had Harris's express oral authority to sign on his behalf and that she handled Harris's business for some time." *Id.* at *3. And, "in Tennessee, the words of an alleged agent, standing alone, aren't enough to prove agency." *Id.* Rather, "agency must 'flow from the manifestation of the principal to the agent.'" *Id.* (brackets omitted) (quoting *Milliken Grp., Inc. v. Hays Nissan, Inc.*, 86 S.W.3d 564, 567 (Tenn. Ct. App. 2001)). A "principal 'must say or do something to make another his agent before a court will find that an agency relationship exists.'" *Id.* (brackets omitted) (quoting *Harben v. Hutton*, 739 S.W.2d 602, 606 (Tenn. Ct. App. 1987)).

14

Here, similarly, Defendant provides only Ms. Miller's representations regarding any authority given to her by Plaintiff. Ms. Miller's representations are equivocal at best. When asked if she had verbal authority from Plaintiff to sign the documents, she answered: "I'm not sure exactly how to answer that. I mean, he knew he was going to the nursing home. He knows he's – you know, everything that was going on, so – I mean, no, I mean, I don't guess he, like, said, 'Here, sign this,' no." [Doc. 32-3 at Page ID # 320]. Ms. Miller continued, "But he knew, you know, what was going on and he knew that I made, you know, the decisions for him." [*Id.*]. She also testified he "kinda" made healthcare decisions, but she would "have to talk to him and explain things to him . . . and then . . . we would go that route," adding "for the most part, I mean, I guess, I'm the one that made the decisions." [Doc. 32-3 at Page ID # 310]. Defendant mentions Plaintiff's catheter, seemingly as an example of Ms. Miller's decision-making authority, but Ms. Miller's testimony on that topic similarly fails to demonstrate an express grant of authority from Plaintiff to Ms. Miller:

> I mean, I don't guess he's really ever made his own medical decisions. I would always, like, you know, explain things to him. I wouldn't just do things without him knowing or anything. I would always talk to him about things. You know, like he's got the catheter, you know, . . . things like that, I would – he would always know, you know, what was going on and what was happening and things like that. But no, I mean, I'm the one that made the decisions.

[Doc. 32-3 at Page ID # 310-11]. Later, she testified that "if you knew my brother, you would know that he's not able to make those [medical] decisions." [*Id.* at Page ID # 312]. She then testifies that she took over her brother's care after her mother died [*id.* at Page ID # 313].

Indeed, as far as the Court can tell, the 2016 POA is the only evidence in the record of Plaintiff expressly granting authority to Ms. Miller. This is consistent with Ms. Miller's deposition testimony that she (erroneously) considered the 2016 POA to be a proper source of her authority

15

Case 4:23-cv-00020-TAV-SKL   Document 37   Filed 01/05/24   Page 15 of 19
PageID #: 389

to bind Plaintiff to the admission-related documents [*see id.* at Page ID # 314]. As discussed above, however, the 2016 POA does not cover healthcare decisions under Tennessee law. *See Hendrix v. Life Care Ctrs. of Am., Inc.*, No. E2006-02288-COA-R3-CV, 2007 WL 4523876, at *5 (Tenn. Ct. App. Dec. 21, 2007) ("Daughter's 'understanding' of the POA does not alter its legal effect, and her erroneous beliefs about the scope of her attorney-in-fact powers certainly cannot create an independent agency relationship.").

I note that under Tennessee law, "implied actual authority" can "be circumstantially established through conduct or a course of dealing between the principal and agent." *Manley v. Humboldt Nursing Home, Inc.*, No. W2019-001310COA-R3-CV, 2020 WL 5587721, at *3 (Tenn. Ct. App. Sept. 18, 2020) (citations omitted). However, "the viability of nursing home arbitration agreements where the asserted authority is implied actual authority is questionable in Tennessee," *see Harris v. Midtown Ctr. for Health & Rehab.*, No. 2:19-cv-02397, JTF-jay, 2021 WL 2222740, at * (W.D. Tenn. June 2, 2021) (collecting cases), *aff'd*, No. 21-5646, 2022 WL 1261830 (6th Cir. Apr. 28, 2022), and Defendant does not cite to any cases wherein it has been successfully relied upon to uphold an arbitration agreement.[3]

Accordingly, I find Defendant has failed to prove the "existence," as a matter of law, of the Arbitration Agreement based on Ms. Miller's alleged actual authority. *See Bazemore*, 74 F.

---

[3] Defendant does not address implied actual authority in its brief other than, perhaps, by passing reference to "prior practice," with no citation to relevant authority. However, as described above, in their normal course of dealings prior to the 2019 admission, Ms. Miller had to talk to Plaintiff and explain things to him. She "wouldn't just do things without him knowing" [Doc. 32-3 at Page ID # 310]. Yet she testified that while Plaintiff "knew" he was going to the nursing home, she "didn't explain the paperwork or nothing to him," and he did not know she signed the admission-related paperwork for him in 2019 [*id.* at Page ID # 317; Page ID # 320]. *See Manley*, 2020 WL 5587721, at *3 (finding no implied actual authority for daughter to sign nursing home admission documents where, *inter alia*, daughter "never discussed the admission documents with her mother or sought her permission before signing them," and further noting "an agent's belief that she had authority is not sufficient" to show actual authority, implied or express (citations omitted)).

16

Case 4:23-cv-00020-TAV-SKL   Document 37   Filed 01/05/24   Page 16 of 19
PageID #: 390

4th at 798 ("The party seeking arbitration must prove that such an agreement exists. If a genuine issue of material fact arises as to whether such an agreement exists, the court 'shall proceed summarily to the trial thereof.'" (citations omitted)).

C. **Apparent Authority**

Defendant further contends Ms. Miller had apparent authority to bind Plaintiff to the Arbitration Agreement. "In general, apparent authority is the power held by the putative agent 'to affect a principal's legal relations with third parties when a third party reasonably believes the [putative agent] has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.'" *Jones*, 2019 WL 6842372, at *5 (quoting *Barbee v. Kindred Healthcare Operating, Inc.*, No. W2007-00517-COA-R3-CV, 2008 WL 4615858, at *6 (Tenn. Ct. App. Oct. 20, 2008)). Defendant contends Plaintiff "clothed Ms. Miller with the authority to make decisions on his behalf" by "knowingly permit[ing] Ms. Miller to make healthcare decisions, to enter into contracts, and to sign paperwork on his behalf." [Doc. 32 at Page ID # 293].

Tennessee courts hold that, generally speaking, mentally incapacitated individuals "may not confer apparent authority" onto putative agents. *Jones*, 2019 WL 6842372, at *5; *see also Ricketts v. Christian Care Ctr. of Cheatham Cnty., Inc.*, No. M2007-02036-COA-R9-CV, 2008 WL 3833660, at *2 (Tenn. Ct. App. Aug. 15, 2008) ("If Ms. Ricketts was not competent at the time she was readmitted, she no longer had the ability to give authority to her daughter."). Defendant points out that individuals over 18 years old are "presumed to be competent" and it cites to Ms. Miller's testimony that she does not recall any doctor ever finding Plaintiff incapable of making his own healthcare decisions [Doc. 32 at Page ID # 290].

Nevertheless, as Plaintiff emphasizes, the Arbitration Agreement that Defendant seeks to enforce includes a provision, signed by Ms. Miller, indicating that at the time of his admission,

17

Plaintiff was "unable to understand the significant benefits, risks, and alternatives to admission to the Facility and to make and communicate health care decisions." [Doc. 32-1 at Page ID # 303]. If Plaintiff was unable to understand and communicate his healthcare decisions, Defendant's reliance on Plaintiff's inaction/silence during the admission process, quite simply, was not reasonable. That is, consistent with Tennessee law on apparent agency, Plaintiff could not "knowingly permit" Ms. Miller to make healthcare decisions if Plaintiff did not understand what he was permitting Ms. Miller to do. Defendant did not address this issue in its opening brief or file a reply to address Plaintiff's arguments regarding mental incapacity and apparent authority in light of the language in the Arbitration Agreement.

Unlike in *Jones*, it appears the parties in this case may dispute whether Plaintiff was mentally incapacitated at the time Ms. Jones signed the Arbitration Agreement. *See Jones*, 2019 WL 6842372, at *5. Relatedly, Plaintiff argues it would be improper to look beyond the four corners of the Arbitration Agreement for evidence of his mental capacity in light of Ms. Miller's representation on the Arbitration Agreement supplied by Defendant. I find it unnecessary to resolve these issues in addressing Ms. Miller's apparent authority in the context of the Renewed Motion. This is because, as established above, if Plaintiff **was not** mentally competent when the Arbitration Agreement was signed, he could not have conferred apparent authority, according to Tennessee law. If Plaintiff **was** mentally competent at the time the Arbitration Agreement was signed, Plaintiff was required by the plain language of the Arbitration Agreement to also sign it himself in order to make it "effective": "To be effective, this Agreement must be signed by the Facility and the Resident's Representative. The Resident must also sign this Agreement if he or she is able to understand the significant benefits, risks, and alternatives to Facility and to make and communicate health care decisions." [Doc. 32-1 at Page ID # 303].

18

Case 4:23-cv-00020-TAV-SKL   Document 37   Filed 01/05/24   Page 18 of 19
PageID #: 392

Accordingly, I find Defendant's reliance on Ms. Miller's alleged apparent authority misplaced. I conclude arbitration cannot be compelled on this ground.

## IV. CONCLUSION

For the reasons set forth herein, I **RECOMMEND**[4] that Defendant's Renewed Motion [Doc. 31] be **DENIED**.

Finally, I further **RECOMMEND** that Plaintiff's request for the Court to "direct the Parties to proceed with litigation in this Court" [Doc. 36 at Page ID # 348] be **DENIED at this time**. *See* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion."). Even if such relief could be requested in a response, given the filings to date it is unclear to me whether Defendant is seeking an opportunity to proceed summarily to a trial on the issue of whether Ms. Miller had actual authority (by some means other than the 2016 POA) to bind Plaintiff to the Arbitration Agreement. The Court may need to address the issue of a summary trial further depending on the nature of objections, if any, that are raised as to this Report and Recommendation.

ENTER:

*s/ Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[4] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).